STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-348

NICK ALAN NATALI

VERSUS

RICKY LYNN HUVAL, JR., ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2021-4782
HONORABLE ROBERT WYATT, DISTRICT JUDGE

**********

**LEDRICKA J. THIERRY**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

**AFFIRMED.**

**Daniel A. Kramer**
**Lundy LLP**
**501 Broad Street**
**Lake Charles, LA 70601**
**(337) 439-0707**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Nick Alan Natali**

**Skipper M. Drost**
**Drost Law Firm, LLC**
**411 Clarence Street**
**Lake Charles, LA 70601**
**(337) 436-4546**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Martin O. Lebleu**

**Ricky Lynn Huval, Jr.**
**In Proper Person**
**1508 Ira Breaux Road (Last Known Address)**
**Lake Charles, LA 70615**
**(337) 255-2772**

**THIERRY, Judge.**

## FACTS AND PROCEDURAL HISTORY

Ricky Lynn Huval, Jr., following the death of his parents, stood to inherit a piece of property in Calcasieu Parish located at 208 Reeves Road in Lake Charles. Huval and Plaintiff, Nick Alan Natali, began discussions about Natali purchasing the property from Huval. It was established that in November of 2020, they agreed upon a price of $25,000.00 for the purchase of the property. It was agreed that Natali would pay Huval the purchase price over time, and that Natali would be able to take possession of the property while he was paying the price. During this time period, it was established that at times Huval was homeless and Natali would pay increments of the price as needed by Huval.

The finalization of the succession that would put Huval in possession of the property would not be completed until October of 2021. By that time, it was determined that Natali paid Huval approximately $13,105.00 of the agreed upon purchase price of $25,000.00.

While accepting the incremental payments from Natali, Huval approached Martin Lebleu about selling him the same property. After some discussion, it was agreed Lebleu would pay Huval $12,500.00 for the property. At some point, Lebleu clearly became aware of the oral agreement for Natali to purchase the same property and the fact that some payments had been made by Natali. The trial court noted that "Lebleu was contacted by Natali, after he'd heard of Huval's attempts to confect a sale to Lebleu, and Lebleu was told of the oral agreement between Huval and Natali, and what had transpired up to that point." The conversation between Natali and Lebleu occurred prior to the finalization of the succession and the Act of Sale between Lebleu and Huval, which was recorded on October 13, 2021.

After executing the Act of Sale with Huval, Lebleu contacted Natali and told him to remove movables he had earlier placed in a storage shed located on the property. The dispute as to ownership went back and forth between Lebleu and Natali for several weeks, with locks being placed and removed by both parties.

On November 12, 2021, Natali filed a "Petition for Specific Performance, Declaratory, and Injunctive Relief." Natali sought to obtain a declaration that Huval's purported sale to Lebleu was null and void, as well as a declaration that Huval's sale to Natali was a valid sale of the property even against Lebleu. Natali also sought to recover for damages to the property caused by certain actions taken by Lebleu. Huval filed a *pro se* answer admitting to the allegations made by Natali against him. He later signed a sworn affidavit acknowledging the verbal agreement to sell made with Natali, payment of a portion of the price, and delivery of the property to Natali.

Eventually, a bench trial was held on September 6, 2023. At trial, Lebleu relied on the Public Records Doctrine, arguing that the verbal sale between Huval and Natali, even if perfected between them, did not affect Lebleu's rights as a third party because he had a recorded deed which predated Huval's affidavit. The trial court disagreed, finding that Lebleu's knowledge of the verbal agreement and accompanying payments made by Natali to Huval "affects his ability to claim the benefits of a good faith buyer." The trial court specifically found that "LeBleu was aware of the overall situation or status of the property as well as Huval's intent to defraud Natali." The trial court noted it did not necessarily know if Huval initiated the sequence of events, but found he "clearly took advantage of the situation, evidently believing that the public records doctrine would resolve the risk." As a result, the trial court declared the Act of Sale between Huval and Lebleu to be null

2

and void.  The trial court further ruled the 2021 sale between Huval and Natali "is hereby declared valid and fully performed between them, with delivery of the following immovable property and price hereby recognized, and with effect against [Lebleu] and all other third parties. . ."  Lastly, the trial court denied all claims for damages.  This appeal followed, wherein Lebleu asserts the following assignments of error:

1.  The trial court erred in awarding the possession and sole ownership of the subject property to Natali by declaring the verbal act of sale between Natali and Huval valid and with effect to all other third parties.

2.  The trial court erred in declaring the Act of Sale between Huval and Lebleu to be null and void.

## ANALYSIS

Louisiana Civil Code Article 2440 provides, "A sale or promise of sale of an immovable must be made by authentic act or by act under private signature, except as provided in Article 1839."  Louisiana Civil Code Article 1839 provides:

A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.

An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.

There is no dispute that the verbal agreement between Natali and Huval was not recorded in the public records prior to the recordation of the Act of Sale between Lebleu and Huval.  Lebleu argues he is entitled to the protections of the public records doctrine.  However, the trial court found that because Lebleu was, at a minimum, complicit in Huval's attempt to defraud Natali, he is not entitled to the protections afforded a good faith buyer by the public records doctrine.

3

Initially, we will address the trial court's factual findings that Lebleu actively participated in fraudulent behavior. Louisiana Civil Code Article 1953 provides that "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." Louisiana Civil Code Article 1957 provides that fraud need only be proven by a preponderance of the evidence, and that such proof "may be established by circumstantial evidence." Fraud is never presumed, and the burden rests upon the person alleging fraud to prove it by a preponderance of the evidence. *Van Meter v. Gutierrez*, 04-706 (La.App. 4 Cir. 2/16/05), 897 So.2d 781; *Bass v. Coupel*, 93-1270 (La.App. 1 Cir. 6/23/95), 671 So.2d 344, *writ denied*, 95-3094 (La. 3/15/96), 669 So.2d 426.

When there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The factfinder's choice between two conflicting, but permissible, views of the evidence cannot be manifestly erroneous. *Stobert v. State, Through DOTD*, 617 So.2d 880 (La.1993).

It is undisputed there was a verbal sale of the property in question by Huval to Natali. Huval acknowledged such in his Answer. Huval's affidavit also recognized the verbal sale to Natali, and Huval admitted to receiving $13,105 of the agreed upon purchase price.[1] Huval also testified in his affidavit that Lebleu specifically told him to tell Natali that the payments made by Natali were just rent

---

[1] We note that Lebleu objected to the admission of Huval's affidavit at trial as hearsay. It was established at trial that Huval was homeless and his whereabouts at the time of trial were not known. He also did not appear for a scheduled deposition. The trial court found that, under La.Code Evid. Art. 801(D)(2), the affidavit was not hearsay as it was a statement offered against Huval's interest and was his own statement. The affidavit was properly admitted.

payments. The record also established that Natali transported movable property onto the premises, which was placed in the storage shed already on the premises.

Rather than dispute what Huval testified to in his affidavit, Lebleu's testimony served to corroborate the statements made by Huval. A portion of his testimony is as follows:

> Q. Mr. Lebleu, are you generally aware that Mr. Natali says that he had a deal with Mr. Huval to purchase the property from Mr. Huval?
>
> A. Yes.
>
> Q. Okay. Will you look at paragraph seven of [Mr. Huval's] affidavit? It's on the third page of the docket. I'm gonna read it out to you, and I'm going to ask you if I'm reading it correctly. "I understand that I should not have sold the property to Mr. Lebleu but did so because he offered me the lump-sum of $12,500 in cash all at once. Mr. Lebleu told me to tell Mr. Natali that Mr. Natali's payments were just rent payments." Did you tell him that?
>
> A. Possibly. I might have said that it's been a couple of years now.
>
> Q. Okay. So in your mind, what was going on here? Did you know that Mr. Natali had already paid some money?
>
> A. So, yeah, let me back up a little bit. So I was at my brother's house, which he was getting some remodeling done at his house, and Ricky Huval was there. I have no clue who Ricky Huval was. I was across the street at my brother's shop, and he come across wanting to know if my brother wanted to buy a piece of land. My brother just recently purchased some more land, and he didn't want to purchase. He asked me if I wanted to buy it. I'm like okay, what do you have? So he told me about it where it was at the location 208 Reeves Road, Moss Bluff. I said, well I'll go check it out. The man came to me. So I went checked it out. . . . I looked at it got back in touch with Ricky Huval and gave him an offer. I said, what do you want for it? He said, well I want – give me $15,000. I said, I'll give you $12,500. As anybody else would do, you gotta negotiate. So I said, who else is involved in this, or what's going on? He said, well you know Nick Natali? I said, yeah, I know Nick Natali, I went to school with him. He said, well he gave me some money to buy the land, and he hasn't given me no more money. I can't get in touch with Nick Natali, he's not the one living underneath the bridges, he's not the one eating out of trash cans. I said, alright that's not my problem, but okay. So I called Nick Natali and asked him what was going on. He told me he was in the process of buying it they had verbal agreement. I got back in touch with Huval. I said, look, y'all

square this away. If something falls through call me back of whatever, we'll go to the attorney and do what we gotta do and make it legal. I don't know if it was three, five days later weeks something like that, he calls me and says "F Nick Natali," he's not the one living underneath the bridge, he's not the one eating out of trash cans. I need money, I can't get no money, let's make the deal.

Lebleu's testimony confirms that he was aware of the verbal sale between Natali and Huval and did not deny that he told Huval to refer to the payments made by Natali as rent payments. As the trial court noted, this clearly evidences that Lebleu "was aware of the overall situation or status of the property as well as Huval's intent to defraud Natali." We find no manifest error in the trial court's findings in this regard.

The primary argument made by Lebleu in brief is his reliance on the public records doctrine as a defense to Natali's claim. He argues he should be protected from the unrecorded interest of Natali. However, Natali argues, although the public records doctrine generally protects third-party purchasers, it does not protect purchasers who have engaged in bad faith or fraud. In support of this position, Natali cites to *Longleaf Investments, L.L.C. v. Tolintino*, 47,545 (La.App. 2 Cir. 12/5/12), 108 So.3d 157. In that case, Longleaf (the buyer) entered into a purchase agreement with Tolintino (the property owner) to purchase immovable property. Tolintino received a $1,000.00 down payment that day. Prior to the purchase agreement being filed in the public records, Tolintino conveyed the same property via quitclaim deed to others, receiving $1,800.00. The quitclaim deed was recorded in the public records on January 24, 2006. Longleaf filed its purchase agreement on February 22, 2006. Upon the discovery of the quitclaim deed, Longleaf sued Tolintino for specific performance. Tolintino conveyed the property subject to the Agreement to Longleaf. Longleaf subsequently filed an action for a concursus and to quiet title to the property, specifically requesting that the quitclaim deeds be cancelled and

"stricken from the record as clouds of the title." The trial court found Tolintino and the second buyer conspired to defraud Longleaf of the property by confecting the quitclaim deeds for the sole purpose of allowing Tolintino to get out of the Agreement. In its written reasons for judgment, the trial court recognized that a third-party purchaser who is guilty of fraud or bad faith is not protected by the public records doctrine. Tolintino and the second buyer appealed. In discussing the applicability of the public records doctrine, the appellate court stated as follows:

> The public records doctrine is generally set forth at La. C.C. art. 3338 et seq. Under this doctrine, a third person need only look to the public records to determine adverse claims. *Carr v. Oaktree Apartments*, 45,514 (La.App. 2 Cir. 8/11/10), 46 So.3d 793, *writ denied*, 2010-2092 (La. 11/12/10), 49 So.3d 896; *Voelkel v. Harrison*, 572 So.2d 724 (La.App. 4 Cir.1990), *writ denied*, 575 So.2d 391 (La.1991). The primary purpose of the public records doctrine is the protection of third persons from unrecorded interests. *Cimarex Energy Co. v. Mauboules*, 2009-1170 (La.4/9/10), 40 So.3d 931; *Carr, supra*. Because it does not create rights but rather denies the effect of certain rights unless they are recorded, the public records doctrine is referred to as a negative doctrine. *Carr, supra*. The public records doctrine provides that an instrument involving immovable property shall be effective against third persons only from the time it is filed for registry in the parish where the property is located. See La. C.C. art. 1839; La. C.C. art. 3338. Third persons are deemed to have constructive knowledge or notice of the existence and contents of recorded instruments affecting immovable property. *Carr, supra*.
>
> A third party purchaser can rely on the public records so long as he does not participate in fraud. *Owen v. Owen*, 336 So.2d 782 (La.1976); *Kinchen v. Kinchen*, 244 So.2d 316 (La.App. 1 Cir.1970), *writ not considered*, 257 La. 854, 244 So.2d 608 (La.1970), 257 La. 854, 244 So.2d 608. The questions of fraud and bad faith are relevant generally to a determination of whether a third party purchaser is entitled to the protection afforded by the public records doctrine. *Simmesport State Bank v. Roy*, 614 So.2d 265 (La.App. 1 Cir.1993); *American Legion v. Morel*, 577 So.2d 346 (La.App. 2 Cir.1991), *writ denied*, 580 So.2d 924 (La.1991).

*Id.* at 160.

The jurisprudence is consistent that third-party purchasers cannot rely on the protections of the public record doctrine if they have engaged in fraudulent behavior

involving the property in question. Therefore, having found that Lebleu was "aware of the status of the property as well as Huval's intent to defraud Natali," Lebleu cannot establish he was a good faith buyer and afford himself of the protections of the public records doctrine.

In conclusion, the record supports the trial court's factual findings that Lebleu actively participated in the fraud against Natali. Such a finding prevents Lebleu from being a good-faith purchaser who can rely on the protections of the public records doctrine.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to Defendant-Appellant, Martin Lebleu.

**AFFIRMED.**